**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | | |
| Plaintiff, | | No. 08-CR-2020-LRR |
| vs. | | **ORDER** |
| DANIEL LEE WILSON, | | |
| Defendant. | | |

_____

*TABLE OF CONTENTS*

I.    *INTRODUCTION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *1*

II.   *RELEVANT PRIOR PROCEEDINGS* . . . . . . . . . . . . . . . . . . . . . . . *1*

III.  *STANDARD OF REVIEW* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *3*

IV.  *FINDINGS OF FACT* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *3*
    A.   *Dogs at Large* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *3*
    B.   *Defendant's Home* . . . . . . . . . . . . . . . . . . . . . . . . . . . *4*
    C.   *Officer Tommasin Enters* . . . . . . . . . . . . . . . . . . . . . . *5*
    D.   *Warrant* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *6*

V.   *CONCLUSIONS OF LAW* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *7*
    A.   *Issues* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *7*
    B.   *Law* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *8*
    C.   *Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *10*
        1.   *Mudroom as part of Defendant's home* . . . . . . . . . . . . . . . *10*
        2.   *Mudroom as curtilage* . . . . . . . . . . . . . . . . . . . . . . . *17*

VI.  *DISPOSITION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *17*

*I. INTRODUCTION*

The matter before the court is Defendant Daniel Lee Wilson's "Objections to Report and Recommendation Regarding Motion to Suppress" ("Objections") (docket no. 48).

*II. RELEVANT PRIOR PROCEEDINGS*

On October 22, 2008, the grand jury returned a two-count Superseding Indictment

(docket no. 5) against Defendant. Count 1 alleges that, on or about May 3, 2008, Defendant knowingly and unlawfully manufactured and attempted to manufacture marijuana, a Schedule I controlled substance, within 1000 feet of the real property of a school, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(D), 846 and 860. Count 2 alleges that, on the same date, Defendant knowingly possessed three firearms in and affecting commerce while an unlawful user of marijuana, in violation of 18 U.S.C. §§ 922(g)(3) and 924(a)(2). The Superseding Indictment also contains a forfeiture provision. The government seeks forfeiture of the three firearms at issue in Count 2, namely, (1) a Savage 22 long rifle, model number 587, serial number B842497; (2) a Stevens 12 gauge shotgun, model number 820B, no serial number; and (3) a Browning 12 gauge shotgun, BPS model 30, serial number 04401RN152.

On December 15, 2008, Defendant filed a Motion to Suppress ("Motion") (docket no. 16). On December 22, 2008, the government filed a Resistance (docket no. 18) to the Motion. Defendant did not file a reply.

On December 29, 2008, a United States Magistrate Judge held a hearing ("Hearing") on the Motion. On January 5, 2009, the Magistrate Judge issued a Report and Recommendation (docket no. 37), in which he advises the undersigned to deny the Motion.

On February 9, 2009, the court adopted the Report and Recommendation as unresisted, because Defendant failed to object to it within the ten-day period set forth in 28 U.S.C. § 636(b)(1), Federal Rule of Criminal Procedure 59(b)(2) and the Report and Recommendation. On the same date, Defendant filed a motion to reconsider, in which he asked the court for permission to file untimely objections. The government did not resist, and the court granted the motion to reconsider. On February 24, 2009, Defendant filed the Objections.

Meanwhile, on January 5, 2009, Defendant appeared before the Magistrate Judge and pled guilty to Counts 1 and 2 of the Superseding Indictment. Pursuant to Federal Rule

of Criminal Procedure 11(a)(2) and the terms of a Plea Agreement (docket no. 31-2), Defendant reserved the right to withdraw his guilty plea if the court grants the Motion.

The Objections are fully submitted and ready for decision.

### III.  STANDARD OF REVIEW

"A district judge may refer to a magistrate judge for recommendation . . . a motion to suppress evidence . . . ." Fed. R. Crim. P. 59(b)(1). "The magistrate judge must promptly conduct the required proceedings." *Id.* "The magistrate judge must enter on the record a recommendation for disposing of the matter, including any proposed findings of fact." *Id.* "Within 10 days after being served with a copy of the recommended disposition . . . a party may serve and file specific written objections to the proposed findings and recommendations." Fed. R. Crim. P. 59(b)(2). "Failure to object . . . waives a party's right to review." *Id.*; *see, e.g., United States v. Flores*, 257 F. App'x. 164, 165-66 (11th Cir. 2007) (per curiam) (explaining that a failure to object waives a constitutional claim).

The district judge is required to "make a de novo determination of those portions of [the Report and Recommendation] to which objection is made." 28 U.S.C. § 636(b)(1); Fed. R. Crim. P. 59(b)(3); *see, e.g., United States v. Uscanga-Ramirez*, 475 F.3d 1024, 1027 (8th Cir. 2007) (stating that de novo review is "required"). The district judge "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1); Fed. R. Crim. P. 59(b)(3). The district judge "may also receive further evidence or recommit the matter to the magistrate judge with instructions." 28 U.S.C. § 636(b)(1); Fed. R. Crim. P. 59(b)(3).

Because Defendant has made specific objections in this case, the following *de novo* review is required. 28 U.S.C. § 636(b)(1); Fed. R. Crim. P. 59(b)(3).

### IV.  FINDINGS OF FACT

#### A.  *Dogs at Large*

On May 3, 2008, Oelwein Police Department Officer Jay Tommasin responded to

3

a report of "dogs at large." A local resident told Officer Tommasin that Defendant owned the dogs. Dispatch informed Officer Tommasin that Defendant lived at 715 Third Avenue SW in Oelwein, Iowa. Officer Tommasin traveled to Defendant's home to investigate.

### B. *Defendant's Home*

Defendant's home is old, shabby and in disrepair. Five steps lead up to a wooden landing in front of the home. The landing is newer than the rest of the home and appears to be well-built. The landing is approximately four feet wide by four feet deep.

The wooden landing leads to a storm door. The storm door contains a large glass window but no screens. The storm door may be locked or unlocked from the inside by means of a handle. It may be locked or unlocked from the outside by means of a key. A keyhole is located a the top of the door's outside handle and is clearly visible from the perspective of a visitor standing on the landing.

There is a doorbell on the jamb of the storm door near the handle. The doorbell is clearly visible from the perspective of a visitor standing on the landing.

A mailbox is posted next to the storm door's outside handle and the doorbell. Above the mailbox are the house numbers. Directly above the door is a light fixture. The mailbox, house numbers and light fixture are all clearly visible from the perspective of a visitor standing on the landing.

The storm door leads into a small enclosed space that protrudes from the rest of the home. This enclosed space, which the court refers to as a "mudroom" throughout the instant Order, is approximately five feet wide and three to four feet deep. The term "enclosed vestibule" also appropriately describes this enclosed space. The court finds that the term "enclosed porch" inadequately describes the mudroom.

Although the entirety of the mudroom extends outward from the rest of Defendant's home, it is sided the same as the rest of the home. The same cinder-block foundation supports the mudroom and the rest of the structure.

Each side of the mudroom has one window. Curtains grace both windows. The storm door, however, is not obscured.

As of May 3, 2008, Defendant stored valuable items in his mudroom, including a coat tree, coats, a tool box, a hammer, paint scrapers, triple-walled chimney pipes and two nail barrels. All of these items were clearly visible from the perspective of a visitor standing on the landing directly in front of the storm door. Inside the nail barrels were an umbrella, a walking stick, dog toys, horseshoes, fishing poles and other items for outdoor recreation.

Inside the mudroom there is another door. This second door is situated directly opposite the storm door and leads into the rest of the home. The door is made of wood, except for a diamond-shaped window near its top. The diamond-shaped window is approximately one foot long by one foot wide. A thin American flag covers the diamond-shaped window and obscures any direct view from the landing or the mudroom into the rest of Defendant's home.

### C. *Officer Tommasin Enters*

At approximately 8:45 p.m. on May 3, 2008, Officer Tommasin arrived at Defendant's home. Officer Tommasin walked up the stairs and onto Defendant's landing. Officer Tommasin heard music emanating from the home. Unbeknownst to Officer Tommasin, Defendant, Defendant's girlfriend Felicia Klein and a friend were grilling hamburgers in the home's kitchen. They also "had corn . . . cooking and . . . had a kind of booze that [they made from] apple juice[,] . . . apple cider, sugar and Everclear . . . ." Tr. at 47.

Officer Tommasin knocked on the storm door three times. Officer Tommasin never rang the doorbell even though it is his usual practice to do so. Receiving no response from inside Defendant's home, Officer Tommasin opened the storm door and entered Defendant's mudroom. At the Hearing, Officer Tommasin testified it was his practice to

5

walk inside unlocked storm doors whenever he did not "gain a response from the outside." *Id.* at 30.[1]

Officer Tommasin knocked on the wooden door inside the mudroom. Although Officer Tommasin again did not receive a response, he peered through the window in the mudroom and saw silhouettes moving behind the flag.

Officer Tommasin knocked again on the wooden door. Ms. Klein answered the door upon hearing this fifth knock. Smoke wafted into the mudroom. Officer Tommasin immediately recognized the smoke as having the smell of burnt marijuana.

Officer Tommasin asked Ms. Klein if he might be permitted to speak with Defendant. Defendant came to the wooden door and immediately ushered Officer Tommasin outside to the wooden landing. Officer Tommasin noticed that Defendant had bloodshot and watery eyes.

Officer Tommasin asked Defendant whether his dogs were running around town loose, and Defendant admitted he was guilty of this municipal infraction. Officer Tommasin ordered Defendant to control his dogs.

Officer Tommasin then asked Defendant whether he was smoking marijuana. Defendant admitted to using marijuana. Officer Tommasin asked Defendant for permission to search the home, but Defendant refused. Officer Tommasin promised Defendant he would leave the premises and obtain a search warrant for the home.

### *D. Warrant*

Officer Tommasin kept his promise. A state magistrate issued a warrant to search Defendant's home, based upon Officer Tommasin's observations while standing in

---

[1] As of May of 2008, Officer Tommasin had two-and-one-half to three years of experience as a police officer.

Defendant's mudroom and during his subsequent conversation with Defendant.[2]

Around 11:30 p.m. on May 3, 2008, Officer Tommasin returned to Defendant's home with other police officers. Pursuant to the search warrant, the officers seized eight marijuana plants, marijuana seeds, drug paraphernalia and three firearms from Defendant's home.

## V. CONCLUSIONS OF LAW

### A. Issues

In the Motion, Defendant argues that Officer Tommasin violated the Fourth Amendment to the United States Constitution when he entered Defendant's mudroom. The parties agree that, if Officer Tommasin's presence in Defendant's mudroom was illegal, the search warrant was tainted and the court must suppress the eight marijuana plants, marijuana seeds, drug paraphernalia and three firearms. In other words, it is undisputed that the state magistrate would not have issued the warrant absent Officer Tommasin's observations while standing in Defendant's mudroom and Defendant's subsequent admission that he was smoking marijuana elsewhere in his home. *See, e.g., Murray v. United States*, 487 U.S. 533, 542 (1988) (discussing the independent source doctrine and reiterating that evidence obtained pursuant to an otherwise valid search warrant must be suppressed "if information obtained during [a prior unlawful] entry was presented to the [m]agistrate and affected his decision to issue the warrant").

Defendant opines that his mudroom "is either part of the actual home itself, or at the very least is curtilage" and thus "is protected by the Fourth Amendment." Brief in

---

[2] Neither the search warrant application nor the supporting affidavit were submitted into evidence at the Hearing. Neither party contests the Magistrate Judge's assumption that "probable cause to search the residence was established by Officer Tommasin detecting the odor of burnt marijuana smoke, observing Defendant's bloodshot and watery eyes, and Defendant's admissions that he . . . [was] smoking marijuana." Report and Recommendation (docket no. 37), at 4.

Support of Motion (docket no. 16-2), at 5-6. The Magistrate Judge rejected Defendant's arguments. Characterizing the mudroom as an "enclosed porch," Report and Recommendation, *passim*, the Magistrate Judge concluded (1) the mudroom was not part of Defendant's home but instead merely an entryway in which he had a diminished expectation of privacy and (2) although the mudroom was part of the curtilage of the home, the officer entered the home for a limited and legitimate purpose that was reasonable under the circumstances. Defendant objects to both of the Magistrate Judge's legal conclusions.

### B. Law

The Fourth Amendment to the United States Constitution provides that "[t]he right of the people to be secure in their . . . houses . . . against unreasonable searches and seizures, shall not be violated . . . ." U.S. Const. amend. IV. "Without question, the home is accorded the full range of Fourth Amendment protections." *Lewis v. United States*, 385 U.S. 206, 211 (1966) (citing in part *Harris v. United States*, 331 U.S. 145, 151 n.15 (1947)). "[P]hysical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." *United States v. U.S. Dist. Ct.*, 407 U.S. 297, 313 (1972).

"The people's protection against unreasonable search and seizure in their "houses" was drawn from the English common-law maxim, 'A man's home is his castle.'" *Minnesota v. Carter*, 525 U.S. 83, 94 (1998) (Scalia & Thomas, JJ., concurring) (emphasis omitted). "At least since 1604 it has been settled that in the absence of exigent circumstances, a government agent has no right to enter a 'house' or 'castle' unless authorized to do so by a valid warrant." *Georgia v. Randolph*, 547 U.S. 103, 123 (2006) (Stevens, J., concurring). "Every occupant of the home has a right—protected by the common law for centuries and by the Fourth Amendment since 1791—to refuse entry." *Id.* at 123-24; *cf. Silverman v. United States*, 365 U.S. 505, 511 (1961) ("At the very core [of the Fourth Amendment] stands the right of a man to retreat into his own home and

there be free from unreasonable governmental intrusion."). The Supreme Court draws a "firm line" at the home's threshold. *Payton v. New York*, 445 U.S. 573, 590 (1980).

"The touchstone of the Fourth Amendment is reasonableness." *Samson v. California*, 547 U.S. 843, 855 n.4 (2006); *Uscanga-Ramirez*, 475 F.3d at 1029 (same). Because Officer Tommasin did not have a warrant when he entered Defendant's mudroom, the government bears the burden to prove such warrantless entry onto Defendant's private property was reasonable under the circumstances. *See Carter v. United States*, 729 F.2d 935, 940 (8th Cir. 1984) ("As a general rule, the burden of proof is on the defendant who seeks to suppress evidence, but on the government to justify a warrantless search." (Citations omitted.)).

Whether the storm door is the threshold to Defendant's home for purposes of the court's Fourth Amendment analysis is a mixed question of law and fact. *See United States v. Brown*, 156 F.3d 813, 815 (8th Cir. 1998) ("Whether Brown was deprived of his rights under the Fourth . . . Amendment[] is a mixed question of law and fact . . . ."). When, as in the present case, the threshold is in dispute and the home "has an enclosed porch, vestibule, or entryway attached to the home," the court must gauge the reasonableness of the law enforcement officers' entry into the home by "giving due consideration to the particular characteristics of the home in question." *State v. Kitchen*, 572 N.W.2d 106, 109 (N.D. 1998) (citing *Cady v. Dombrowski*, 413 U.S. 433, 439 (1973) ("The ultimate standard set forth in the Fourth Amendment is reasonableness."")).[3] "[I]n justifying the particular intrusion the [government] must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Terry v. Ohio*, 392 U.S. 1, 21 (1968); *State v. Crider*, 341 A.2d 1, 5 (Me.

---

[3] Defendant's home is apparently unlike any other structure in the reported history of search-and-seizure jurisprudence. Neither the parties nor the Magistrate Judge found any cases precisely on point, and the undersigned has found none. The court resorts to reliance upon non-binding decisions.

1975).

## C. Analysis

### 1. Mudroom as part of Defendant's home

The court holds that Officer Tommasin violated the Fourth Amendment when he entered Defendant's mudroom. The court finds that the mudroom was part of Defendant's home and hence the storm door was the home's threshold. Officer Tommasin's decision to open the storm door under admittedly non-exigent circumstances was unreasonable and crossed the Supreme Court's "firm line" against warrantless searches of homes. *Payton*, 445 U.S. at 580.

At the Hearing, Defendant—and to a much lesser extent, the government—provided the court with a series of photographs of his home. These photographs disclose a number of characteristics of Defendant's home that lead the court to conclude that the storm door is its threshold.

The mudroom shares the same cinder-block foundation as the rest of Defendant's home. The siding is identical. In addition, the mudroom has two glass windows graced with curtains. *See, e.g., State v. Reiner*, 628 N.W.2d 460, 467 (Iowa 2001) (observing that "[t]he porch of Reiner's house was just like any other portion of her house" and "[i]t had glass encased windows covered with blinds" and holding that law enforcement officers' entry onto the porch violated the Fourth Amendment); *State v. Kochel*, 744 N.W.2d 771, 774 (N.D. 2008) (holding officers violated the Fourth Amendment when they entered an "addition" to the defendant's home, where "[v]iewing the exterior of the addition, the structure is fully enclosed by wooden walls complete with a door and a window"). There is a relatively large wooden landing outside the storm door. Clearly, the landing was constructed as a place for visitors to wait while the occupants of the home respond to a knock of the door or ring of the doorbell. *See, e.g., United States v. Trujillo*, 316 F. Supp. 2d 1163, 1166 (D. Utah 2004) ("The side-door entrance to the house

requires a person to walk up a few steps to a landing prior to gaining entrance to the house."). The doorbell is situated on the jamb of the storm door, in the event a knock is insufficient to arouse the homeowner. *Cf. State v. Kennedy*, No. 00-2058, 2002 WL 984515, *3 (Iowa Ct. App. May 15, 2002) (holding that the police did not violate the Fourth Amendment when they entered the defendant's front porch, in part because the fact no doorbell was posted outside of the porch was an indication that the defendant did not have a legitimate expectation of privacy in the porch). The mailbox is placed outside the storm door, not in the mudroom. The location of mailbox is a clear indication to the mailman and others that deliveries should be placed outside the storm door, either in the mailbox itself or on the landing. *Cf. People v. Gordon*, 831 N.Y.S.2d 834, 836-37 (Sup. 2006) (holding that the police did not violate the Fourth Amendment when they entered an enclosed vestibule, which contained the residents' mailboxes, and reiterating "the principle that what the [police] did was no more intrusive than allowed to be done by a 'paperboy, garbage collector or door-to-door salesman.'" (quoting *People v. Crapo*, 479 N.Y.S.2d 779, 780 (App. Div. 1984)). A light hangs directly above the storm door to illuminate the landing. The home's numbers are outside the mudroom—not within it. The door was able to be locked from the outside. The keyhole is plainly visible at the top of the door's outside handle and reminds visitors that Defendant expects privacy within the mudroom. Defendant stores valuable items inside the mudroom that would have been visible to a visitor standing on the landing. *See, e.g., Reinier*, 628 N.W.2d at 467 (holding that the fact the defendant "stored personal belongings in the porch" showed expectation of privacy within the porch); *Kochel*, 744 N.W.2d at 774 ("Kochel stores many personal items in the addition that would have been visible to someone at the threshold . . . . This suggests the addition was being used as a room rather than as a[n] . . . entryway."). All of these facts tend to show that the mudroom is part of Defendant's home. Further, all of these facts should have been apparent to Officer Tommasin as he stood on the landing.

11

The government argues that the mudroom was not part of Defendant's home because the storm door was largely made of glass and Defendant left it unlocked on May 3, 2008. Neither fact is dispositive; neither fact rendered Defendant's mudroom impliedly open to the public. Glass front doors are not unknown in Iowa, and the mere fact Defendant did not place a curtain on his glass door cannot carry the day for the government. "While an open door may 'invite the gaze of curious passers-by and lessen the reasonable anticipation of privacy in the home,' it does not alone justify an officer's entry into the home." *Kochel*, 744 N.W.2d at 775 (quoting *State v. Sakellson*, 379 N.W.2d 779, 782 (N.D. 1985)). Moreover, it is not uncommon for residents of small towns such as Oelwein to leave their doors unlocked. Indeed, Defendant testified that people in his neighborhood generally do not lock the doors to their homes. *Cf.* 1 Wayne R. Lafave, *Search & Seizure: A Treatise on the Fourth Amendment* § 2.3(b), at 569 ("LaFave") ("We have seen that the absence of a lock on the premises is typically viewed as manifesting that hallways and other common areas are open to the public when the place is an apartment building, hotel or motel, but not when the place is a one-unit residence."). The salient point is that a reasonable officer would have noticed the keyhole on the storm door as an indication the door was *lockable* and he should not enter. *See, e.g., State v. Titus*, 707 So.2d 706, 709-10 (Fla. 1998) (holding fact that outer door to rooming house was not locked did not render the house open to the general public).

Nothing in this opinion should be read to suggest that Officer Tommasin was not justified in walking to Defendant's house, alighting the landing and knocking on the storm door.

> Absent express orders from the person in possession against any possible trespass, there is no rule of private or public conduct which makes it illegal per se, or a condemned invasion of the person's right of privacy, for anyone openly and peaceably, at high noon, to walk up the steps and knock on the front door of any man's "castle" with the honest intent of

> asking questions of the occupant thereof whether the questioner be a pollster, a salesman, or an officer of the law.

*Davis v. United States*, 327 F.2d 301, 303 (9th Cir. 1964) (cited with approval in *United States v. Cecil*, 457 F.2d 1178 (8th Cir. 1972)). In other words, "when the police come on to private property to conduct an investigation or for some other legitimate purpose and restrict their movements to places visitors could be expected to go (e.g., walkways, driveways, porches), observations made from such vantage points are not covered by the Fourth Amendment." LaFave § 2.3(f), at 600-03 (footnotes omitted). In such circumstances, the officers have no less right to be there than any member of the public calling at that home, including but not limited to "'newspaper boys, postmen, Girl Scout cookie sellers, distressed motorists, neighbors, [and] friends.'" *Id.* at 599 (quoting *State v. Corbett*, 516 P.2d 487, 490 (Or. Ct. App. 1973)).

The problem for the government in the case at bar is that no reasonable newspaper boy, postman or Girl Scout cookie seller would have opened Defendant's storm door and entered the mudroom without Defendant's permission. The postman would have left his mail in the mailbox outside the storm door, and the newspaper boy and the Girl Scout would have knocked, rang the doorbell and then left if there were no response from within Defendant's home. It is also important to point out that it was nighttime when Officer Tommasin entered Defendant's mudroom, not "high noon." *Cf. Davis*, 327 F.2d at 303; *Reinier*, 628 N.W.2d at 467. "It is not unreasonable for police officers, in the pursuit of criminal investigations, to seek interviews with subjects or witnesses at their homes, but their right to call upon them at their homes for such purposes does not include the right to walk in uninvited merely because there is no response to a knock or a ring." *Crider*, 341 A.2d at 5 (citing *People v. Haven*, 381 P.2d 927 (Cal. 1963)).

The touchstone of the Fourth Amendment is reasonableness. *Samson v. California*, 547 U.S. 843, 855 n.4 (2006). While it cannot be doubted that Officer Tommasin approached Defendant's home on legitimate business, his entry into Defendant's mudroom

13

was unreasonable under the totality of the circumstances. A reasonable officer would not have entered Defendant's mudroom after knocking three times and not receiving a response from the occupants of Defendant's home.[4] A reasonable officer would have rang the doorbell, contacted dispatch for Defendant's phone number or simply waited outside the house. The government does not argue that the circumstances of dogs at large were so exigent as to require a warrantless entry. Accordingly, the court holds that Officer Tommasin's entry into the mudroom violated the Fourth Amendment. As the Supreme Court has recognized:

> [A]ny physical invasion of the structure of the home, "by even a fraction of an inch," [is] too much, and there is certainly no exception to the warrant requirement for the officer who barely cracks open the front door and sees nothing but the nonintimate rug on the vestibule floor. In the home . . . all details are intimate details, because the entire area is held safe from prying government eyes.

---

[4] Stated another way, Defendant had a reasonable expectation of privacy in his mudroom. Defendant testified that he considered the mudroom part of his home and the only person to ever enter the mudroom uninvited in the preceding five years was Officer Tommasin. Deliverymen always left packages on the landing; the pizza man always stood outside the storm door; and other police officers investigating crimes at Defendant's house always stood on the landing and left their citations posted on the outside of the storm door. *See, e.g., State v. Breuer*, 577 N.W.2d 41, 46 (Iowa 1998) ("Breuer testified that visitors usually waited at the outer door after ringing the doorbell. This fact supports a finding that Breuer had a subjective expectation of privacy in the stairway."). Defendant's reaction to Officer Tommasin's presence in the mudroom—immediately shuttling Officer Tommasin out the door—corroborates Defendant's testimony. The issue is whether society is prepared to recognize Defendant's subjective expectation of privacy as objectively reasonable. *See Katz v. United States*, 389 U.S. 347, 361 (1967) (Harlan, J., concurring); *Breuer*, 577 N.W.2d at 46. Because the court finds that the mudroom was part of Defendant's home, it is beyond peradventure that society is prepared to recognize Defendant's subjective expectation of privacy therein to be reasonable. "[A] man's home is, for most purposes, a place where he expects privacy . . . ." *Id.*; *United States v. Reed*, 733 F.2d 492, 501 (8th Cir. 1984) (quoting this portion of Justice Harlan's concurrence with approval).

*Kyllo v. United States*, 533 U.S. 27, 37 (2001) (citation omitted). Because it is undisputed that the state magistrate issued the warrant to search Defendant's home based upon Officer Tommasin's observations while standing in Defendant's mudroom and subsequent conversation with Defendant, all evidence obtained as a result of such warrant must be suppressed. *Murray*, 487 U.S. at 542.

In holding that Officer Tommasin's entry into the mudroom was reasonable, the Magistrate Judge relied upon *State v. Kitchen*, 572 N.W.2d 106 (N.D. 1998). *Kitchen* is distinguishable. *Kitchen* involved a mere "enclosed entryway" to a home, 572 N.W.2d at 107, not a mudroom. Other circumstances surrounding the "enclosed entryway" were different than those surrounding the "mudroom" in the case at bar. For example, there is no indication the "enclosed entryway" shared the same siding and foundation as the rest of the home. There is no indication the defendant in *Kitchen* placed a mailbox or constructed a landing outside the storm door leading into the "enclosed entryway." The door handle in *Kitchen* was not visibly lockable from the outside; indeed, it was only lockable from inside the entryway.[5]

In any event, to the extent *Kitchen* is factually similar to the case at bar, the court agrees with the following observations of the dissent:

> Residents of a house clearly have a justified expectation of privacy against unreasonable intrusion. An unconsented police entry into a home, without a warrant, is an unreasonable search. *See Minnesota v. Olson*, 495 U.S. 91, 98 (1990) ("To hold that an overnight guest has a legitimate expectation of

---

[5] The court notes that, while the defendant in *Kitchen* placed a doorbell outside the "enclosed entryway," the law enforcement officers in *Kitchen*—unlike Officer Tommasin—rang the doorbell. Further, it must be remembered that *Kitchen* is an appellate court decision. The North Dakota Supreme Court was operating under a somewhat limited standard of review. The Court only held that the trial court's decision that the defendant did not have subjective expectation of privacy in his enclosed entryway was "not against the manifest weight of the evidence." 572 N.W.2d at 109.

15

privacy in his host's home merely recognizes the everyday expectations of privacy that we all share."). These constitutional protections extend to "occupants of flimsily constructed dwellings with unobstructed window or other openings directly on public lands, streets, or sidewalks, who failed to lock their doors to bar entrance." *United States v. Moss*, 963 F.2d 673, 676 (4th Cir. 1992). . . . [T]he "mere presence of a hallway in the interior of a single family dwelling, without more, is not in itself an invitation to the public to enter." Normally, the entryway is an integral part of a home.

\* \* \*

"[A] lockable door and a doorbell button clearly mark the threshold, the point of entering a home.

In this case, the officers rang the doorbell, waited momentarily, then opened the unlocked outer door and went into the entryway to knock on the inner door. In my opinion, they crossed the threshold of a private home. Since they had neither consent nor a warrant, I believe their entry was unreasonable, and the evidence they then discovered was unreasonably obtained.

> The officer, at the time of his entry into the hallway, had neither warrant for an arrest or search, nor did he have probable cause for the same. His entry into an integral part of a private dwelling, which in the light of the circumstances of this record could not be viewed as reasonably accessible to the public generally, constituted a trespass.

*Crider*, 341 A.2d at 4-5. Sadly, many an urban resident today must lock their outer door to secure privacy, but I hate to think Dakotans need to do so, yet.

*Kitchen*, 572 N.W.2d at 112 (Meschke, J., dissenting).

### *2. Mudroom as curtilage*

In the alternative, Defendant contends the mudroom is at the very least the "curtilage" of his home, that is, "the area to which extends the intimate activity associated with the sanctity of a man's home and the privacies of life." *Oliver v. United States*, 466 U.S. 170, 180 (1984). In light of the court's finding that the mudroom is part of Defendant's home and holding that Officer Tommasin violated the Fourth Amendment when he entered the mudroom without a warrant, the court need not address Defendant's alternative argument that his mudroom is part of the "curtilage" of his home.

### VI. DISPOSITION

The Objections (docket no. 48) are **SUSTAINED**. The Report and Recommendation (docket no. 37) is **SET ASIDE**. The Motion (docket no. 16) is **GRANTED**. The eight marijuana plants, marijuana seeds, drug paraphernalia and three firearms seized from Defendant's home on May 3, 2008 are **SUPPRESSED**. If Defendant wishes to retract his guilty plea, he must file an appropriate notice within ten court days of the filing of the instant Order.

**IT IS SO ORDERED.**

**DATED** this 30th day of March, 2009.

_____
LINDA R. READE
CHIEF JUDGE, U.S. DISTRICT COURT
NORTHERN DISTRICT OF IOWA